**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GAYLAN HARRIS, on behalf of himself and others similarly situated, *Plaintiff-Appellant*, | No. 13-56061 |
| | D.C. No. 8:09-cv-00098-AG-MLG |
| v. | |
| COUNTY OF ORANGE, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued February 6, 2014
Submitted August 28, 2018
Pasadena, California

Filed September 5, 2018

Before: Marsha S. Berzon, Johnnie B. Rawlinson,[*]
and Michael R. Murphy[**], Circuit Judges.

Opinion by Judge Berzon

---

## SUMMARY[***]

### Employment Benefits

The panel affirmed in part, and reversed in part, the district court's dismissal of an action brought by a class of retired employees alleging that the County of Orange violated their vested rights when it restructured its health benefits program; and remanded for further proceedings.

The County restructured two retiree benefits: the Retiree Premium Subsidy (which combined active and retired employees into a single unified pool for purposes of calculating medical insurance premiums); and the Grant Benefit (providing retired employees with a monthly grant to defray the cost of health care premiums). The retirees contended that the County's decision in 2006 to eliminate

---

[*] This case was originally submitted to a panel that included Judge Pregerson. Following Judge Pregerson's death, Judge Rawlinson was drawn by lot to replace him. Ninth Circuit General Order 3.2(h). Judge Rawlinson has read the briefs and reviewed the record.

[**] The Honorable Michael R. Murphy, Senior Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the Retiree Premium Subsidy and to reduce the Grant Benefit increased their health care costs significantly.

The retirees alleged that they had an implied contractual right to receive the Grant Benefit throughout their retirement.  The panel held that the retirees' second amended complaint set forth sufficient allegations regarding the continuation of the Grant Benefit during the employees' lifetime to survive a motion to dismiss.  The panel noted that the retirees alleged the existence of annual memorandum of understanding between the union and the County, establishing a right to the Grant Benefit; and the retirees' specific allegations plausibly supported the conclusion that the County impliedly promised a lifetime benefit, which could not be eliminated or reduced.  The panel reversed the district court's order insofar as it dismissed the retirees' contract claims regarding the Grant Benefit.

The retirees' California Fair Employment and Housing Act ("FEHA") age discrimination claim challenged the elimination of the Retiree Premium Subsidy.  The panel noted that retirees had no contractual right to continue receiving the Retiree Premium Subsidy pursuant to the holding in *Retired Emps. Ass'n of Orange Cty., Inc. v. Cty. of Orange (REAOC V)*, 742 F.3d 1137 (9th Cir. 2014).  The panel held that California law did not fault the County for offering different benefits to retirees and to active employees at the outset, absent a FEHA violation.  The panel further held that the retirees' FEHA claim was a novel one, and therefore the panel looked to federal cases interpreting employment discrimination and civil rights for guidance.  The panel held that the federal Age Discrimination in Employment Act applied to retirees.  The panel further held that changes in retirees' health benefits were covered by FEHA, despite the fact that they were not active employees.

The panel concluded that the County, under the Age Discrimination in Employment Act, and so, under California's FEHA age discrimination provisions, may treat retirees *as a group* differently, with regard to medical benefits, than employees *as a group*, taking into account that the cost of providing medical benefits to the retiree group was higher because the retirees were on average older. Accordingly, retirees' claim of unlawful age discrimination under FEHA failed as a matter of law, and the panel affirmed the district court's dismissal of the claim.

## COUNSEL

Michael P. Brown (argued), Law Office of Michael P. Brown, Seattle, Washington, for Plaintiff-Appellant.

Arthur A. Hartinger (argued) and Jennifer L. Nock, Renne Sloan Holtzman Sakai LLP, Oakland, California, for Defendant-Appellee.

## OPINION

BERZON, Circuit Judge:

This is the fourth time we have been asked to consider whether the County of Orange ("the County") violated the vested rights of its retired employees when it restructured its health benefits program. This time, we are asked to consider whether two reforms adopted by the County in 2006 deprived the plaintiffs of vested employment benefits, in violation of the County's contractual obligations, and constituted age discrimination, in violation of California's Fair Employment and Housing Act ("FEHA").

We affirm the district court's dismissal of the FEHA claim, but conclude that the district court erred in dismissing certain of Retirees' contract claims. We accordingly reverse in part and remand.

## I.

This case arises out of the restructuring of two benefits the County provided to its retirees: the Retiree Premium Subsidy and the Grant Benefit.

*Retiree Premium Subsidy.* The County began offering group medical insurance to its retired employees in 1966. Initially, premiums were calculated separately for active and retired employees. The County paid a large portion of the premiums for active employees, but retirees paid most of their own premiums.

In 1985, the County combined active and retired employees into a single unified pool for purposes of calculating premiums. Because retired employees are, on average, older and more expensive to insure for medical coverage than active employees, retirees, if pooled separately, pay higher premiums. By allowing retirees to participate in a single unified pool, the County effectively established a health insurance subsidy for retirees, lowering their premiums while raising active employee premiums (largely paid by the County) above the actual cost of covering active employees as a separate group. For purposes of the present litigation, this benefit is called the "Retiree Premium Subsidy."

*Grant Benefit.* From 1993 through 2007, retired employees also received a monthly grant (the "Grant Benefit") to defray the cost of health care premiums. The terms of the Grant Benefit were set forth in Memoranda of

Understanding ("MOUs") between the County and its union-represented employees. The monthly grant for retirees was calculated by multiplying an employee's years of service at retirement by a fixed-dollar amount ("the Grant Multiplier"). The initial Grant Multiplier was $10, but it increased every year by up to 5%, to reflect inflation.

The Grant Benefit was established in 1993 after years of negotiations between the County and its labor unions. In return for the Grant Benefit, the unions and the Orange County Employee Retirement System ("OCERS") agreed to allow the County to access $150 million in surplus investment earnings controlled by OCERS. The County intended the Grant Benefit to induce employees to retire early, allowing the County to reduce its workforce. The Benefit was funded by a mandatory contribution from active employees of 1% of their gross monthly wages,[1] as well as investment earnings from a portion of the OCERS surplus. Under the agreements governing the 1993 Grant Benefit, the County was obligated to "step in" if the 1% contribution and investment earnings were insufficient to cover program expenses. In addition, any employee who left County employment before becoming eligible for a Grant Benefit would receive a lump sum cash rebate of his 1% salary contribution.

Retirees attach to their complaint the 1993–94 MOU and the Board of Supervisors resolution formally adopting it, as an "exemplar" of the agreements reached between the

---

[1] In submissions after oral argument, the parties disputed whether employees contributed 1% of their otherwise payable wages, or whether, instead, the County agreed to increase wages by 1% for the purpose of funding the Grant Benefit. For reasons addressed below, this dispute is not material for present purposes.

County and its main labor union each year between 1993 and 2007. The MOU provides that "[e]ffective August 1, 1993[,] the County shall administer a Retiree Medical Insurance Grant plan for employees who have retired from County service and who meet the eligibility requirements set forth in" other provisions of the MOU. It further provides that "[u]pon . . . County retirement, an eligible retiree . . . shall receive a" Grant Benefit. Retirees allege that "[t]he terms contained in the remaining MOUs in effect between 1993 and 2007 . . . are materially the same."

*2008 Benefits Reductions.* Beginning in 2004, the County negotiated with its labor unions to restructure the retiree medical program, which was underfunded. Two years later, the Board of Supervisors approved an agreement with the labor union that made the following relevant reductions in benefits for retirees: (1) the County would split retired and active employees into separate pools to set premiums; (2) the maximum increase for the Grant Multiplier would be reduced from 5% to 3%; and (3) once a retiree became eligible for Medicare (at age 65), the Grant Benefit would be reduced by 50%.

Retirees allege that the County's decision to eliminate the Retiree Premium Subsidy and to reduce the Grant Benefit increased their health care costs significantly. Some retirees cannot afford the increases and have had to abandon their County-sponsored health insurance for plans with lesser benefits.

*REAOC Litigation.* On November 5, 2007, the Retired Employees Association of Orange County, Inc. ("REAOC"), a non-profit representing County retirees and their spouses, filed suit challenging the County's decision to eliminate the Retiree Premium Subsidy. The district court granted summary judgment in favor of the County in the *REAOC*

case, holding that the County was not obligated to provide the Retiree Premium Subsidy for the duration of Retirees' lives because there was no evidence of "any explicit legislative or statutory authority" requiring the County to do so, and because that obligation could not arise by implication from past practices or the parties' course of dealing. *Retired Emps. Ass'n of Orange Cty., Inc. v. Cty. of Orange (REAOC I)*, 632 F. Supp. 2d 983, 987 (C.D. Cal. 2009).

On appeal, we certified to the California Supreme Court the question "[w]hether, as a matter of California law, a California county and its employees can form an implied contract that confers vested rights to health benefits on retired county employees." *Retired Emps. Ass'n of Orange Cty., Inc. v. Cty. of Orange (REAOC II)*, 610 F.3d 1099, 1101 (9th Cir. 2010). The California Supreme Court, answering the certified question, held that "under California law, a vested right to health benefits for retired county employees can be implied under certain circumstances from a county ordinance or resolution." *Retired Emps. Ass'n of Orange Cty., Inc. v. Cty. of Orange (REAOC III)*, 52 Cal. 4th 1171, 1194 (2011). In light of that response, we remanded the case to the district court for further proceedings. *Retired Emps. Ass'n of Orange Cty., Inc. v. Cty. of Orange (REAOC IV)*, 663 F.3d 1292 (9th Cir. 2011). On remand, the district court again entered summary judgment in favor of the County, finding that REAOC had failed to show the existence of an implied contract right to the pooled premium. REAOC appealed, and this Court affirmed. *See Retired Emps. Ass'n of Orange Cty., Inc. v. Cty. of Orange* (*REAOC V*), 742 F.3d 1137 (9th Cir. 2014).

*Harris Litigation*. While the *REAOC* case was pending, Plaintiffs, on behalf of thousands of retired Orange County employees (collectively, "Retirees"), filed this class action,

which was assigned to the same district judge presiding over the *REAOC* litigation.  The complaint alleged that the County breached its contractual obligations to Retirees by eliminating the Retiree Premium Subsidy and reducing the Grant Benefit, and that the elimination of the Retiree Premium Subsidy also constituted age discrimination in violation of California's Fair Employment and Housing Act. The *Harris* and *REAOC* litigations overlap to the extent both seek declaratory and injunctive relief related to the County's elimination of the Retiree Premium Subsidy.  But this class action, *Harris*, also seeks damages, pleads claims relating to the reduction of the Grant Benefit, and asserts a FEHA claim not alleged in *REAOC*.

Like *REAOC*, this case has a lengthy procedural history, including a prior trip to this Court.  In 2011, the district court granted the County's motion for judgment on the pleadings, holding, inter alia, that Retirees' contract claims relating to the Grant Benefit should be dismissed because Retirees had not identified any "explicit legislative or statutory authority" that required the County to provide the Grant Benefit in perpetuity.[2]  While an appeal was pending, the California Supreme Court issued its answer to the certified question in the *REAOC* litigation.  In light of *REAOC III*, we reversed the district court's Rule 12(c) dismissal, concluding that although "there was no explicit legislative or statutory authority requiring the County to provide the Grant [Benefit] in perpetuity," the "district court should have granted the Retirees leave to amend."  *Harris v. Cty. of Orange (Harris I)*, 682 F.3d 1126, 1134 (9th Cir. 2012).

---

[2] The district court also dismissed the FEHA and Retiree Premium Subsidy claims for procedural reasons not relevant to the current appeal.

On remand, Retirees filed a Second Amended Complaint ("SAC"). The allegations in the SAC mirrored those in the prior complaint with regard to the Retiree Premium Subsidy claims. With regard to the Grant Benefit claims, Retirees alleged that the County *impliedly* promised to provide the Grant Benefit for life, as shown in the express terms of the relevant MOUs *and* by extrinsic evidence of the parties' intent.

On January 30, 2013, the district court granted the County's motion to dismiss the SAC. The court dismissed the contract claims relating to the Grant Benefit with prejudice "because there is no explicit legislative or statutory authority requiring the County to provide the retirement benefits associated with the Grant," and because "the minimal changes made in the[] SAC still fail to address the problems previously identified by this Court and the Ninth Circuit." The FEHA claim was dismissed as well, on the ground that "Plaintiffs have provided no legal authority that FEHA prohibits this action" — splitting the premium pool into separate retiree and active pools — "which is based on retirement status and is facially neutral to age." But because the application of FEHA in this context was a "somewhat murky area of law[,]" the district court granted leave to amend that claim.

Less than a month later, another panel of this Court issued its opinion in *Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty.*, 708 F.3d 1109 (9th Cir. 2013), in which retirees alleged that Sonoma County had breached its obligation to provide certain health care benefits in perpetuity. Noting that the district court in that case "did not have the benefit of" the California Supreme Court's answer to the certified question in the *REAOC* litigation — "that a public entity in California can be bound by an implied term

in a written contract under specified circumstances" — this Court reversed the dismissal of the *Sonoma* complaint so that the retirees could attempt "to plausibly allege that the County used resolutions or ordinances to ratify or approve MOUs that created contracts for healthcare benefits and included implied terms vesting those benefits for perpetuity." *Id.* at 1119–20. *Sonoma* briefly discussed the *Harris I* appeal. *See id.* at 1119.

In light of *Sonoma*, Retirees moved for reconsideration of the district court's January 30, 2013 order dismissing the SAC, asserting that *Sonoma* made clear that "retired county employees could premise claims to vested retirement health benefits on an implied contract theory, supporting their claim to vesting solely . . . by extrinsic evidence of the parties' intent." The district court denied the motion for reconsideration.

Retirees then filed a Third Amended Complaint ("TAC"), reasserting all claims, and the County again moved to dismiss the complaint. At the hearing on the County's motion, Retirees described and offered to submit additional evidence purporting to show that the County's reason for eliminating the Retiree Premium Subsidy was based on Retirees' age. The district court, taking the proffered evidence into account, once more dismissed the contract-based claims for the reasons given in the January 30, 2013 order. The court also dismissed the FEHA claim, this time with prejudice, concluding "that 'splitting the pool' between retired employees and active employees is not actionable age discrimination under FEHA."

Retirees moved for reconsideration, seeking leave to file a Fourth Amended Complaint that included the evidence they had described at the hearing regarding the motion to dismiss the TAC. The district court denied the motion,

stating that it had already considered the new allegations and evidence presented at the hearing.

After judgment was entered in favor of the County on all claims, Retirees timely appealed.  The appeal challenges the dismissal of three categories of claims: (1) contract claims related to the reduction of the Grant Benefit; (2) contract claims related to the elimination of the Retiree Premium Subsidy; and (3) the FEHA claim related to the elimination of the Retiree Premium Subsidy.

*REAOC V* directly addressed the second set of claims. *See* 742 F.3d at 1142–44.  As this case is indistinguishable from *REAOC V* as to those claims, we affirm the district court's dismissal of Retirees' claims that the County breached its contractual obligations by eliminating the Retiree Premium Subsidy.  We address the other two claims, not covered by *REAOC V*, in turn.

## II. Implied Contract

### A.

Retirees allege that they had an implied contractual right to receive the Grant Benefit throughout their retirement.  As in *REAOC V*, it is undisputed that the County and its retirees had annual contracts providing for health benefits.  *Id.* at 1140.  "Th[ose] contract[s] [were] the product of negotiations resulting in binding MOUs . . . adopted by County resolution . . . between the County and" its employees.  *Id.*  The entitlement to the Grant Benefit was set forth expressly in the MOUs, which stated that "[u]pon . . . County retirement, an eligible retiree . . . shall receive" a Grant Benefit, which is then described.  Retirees therefore allege an *express* contractual right to the Grant Benefit for some period.  The question on appeal is whether those

annual contracts also contained, as an *implied* term, a promise that the Grant Benefit would continue during their retirement.

The district court dismissed the Grant Benefit contract claims with prejudice, relying on *Harris I* as holding that "'to state a claim for a contractual right to the Grant, the Retirees must plead specific resolutions or ordinances establishing that right.'" "Plaintiffs here have failed to do so," the district court stated. "Instead, they pointed to documents already found insufficient by this Court and the Ninth Circuit to allege a term guaranteeing continuance of the grant — the 1993–1994 MOU and the Board resolution enacting it." Furthermore, the district court concluded, "Plaintiffs' 'circumstantial evidence' of legislative intent does not salvage these claims."

To begin, the district court misread this Court's decision in *Harris I*. *Harris I* did not directly address Retirees' implied contract claim, as clarified in the SAC, with respect to the Grant Benefit. *Sonoma* explained the limits of *Harris I*: "The retirees in *Harris [I]* asserted two claims, one based on an implied promise to subsidize health insurance premiums . . . via a pooling arrangement," the Retiree Premium Subsidy claim, "and the other based on the county's *express* promise . . . to provide a monthly grant toward the cost of health insurance," the Grant Benefit claim. *Sonoma*, 708 F.3d at 1119 (emphasis added). It was only on remand that Retirees clarified their allegations as encompassing both express terms as to the substance of the Grant Benefit and an *implied term* that required the County to continue providing that benefit during their retirement.[3]

---

[3] Specifically, the FAC alleged only that "Plaintiffs had a contractual right to the Grant and other benefits of the Grant Program *as that*

In short, "in dismissing the claims based on the express written contract," *Harris I* "did not purport to rule on a theory premised on implied terms or to interpret or apply" the California Supreme Court decision in *REAOC III*, as that theory was not spelled out in the complaint reviewed in *Harris I*. *Sonoma*, 708 F.3d at 1119.

The County characterizes *Harris I*'s remand as having been very limited in scope, suggesting, perhaps, that Retirees should not have been permitted to amend the complaint to allege an implied contract term. The County contends that *Harris I* "remanded with only one instruction on this issue: 'to amend their Complaint to set out specifically the terms of those MOUs on which their claim is predicated.'" We do not read *Harris I* so narrowly.

*Harris I* held that Retirees "should be granted leave to amend their Complaint to set forth facts establishing their claimed right to receive the Grant in perpetuity." 682 F.3d at 1135. Although we suggested that one way to establish such a right would be by "set[ting] out specifically the terms of those MOUs on which the[] claim is predicated," *Harris I* did not prohibit Retirees from amending the complaint to establish that same right by other means. *Id.* Indeed, in identifying the FAC's flaws, *Harris I* noted that "Retirees have failed to plead facts that suggest that the County promised, in the MOUs *or otherwise*, to maintain the Grant as it existed on the Retirees' respective dates of retirement." *Id.* (emphasis added). Retirees' allegations in the SAC regarding an implied right to the Grant Benefit supported by

---

*program was reflected* in the MOUs in place on the date of their respective retirements," while the SAC alleged that "Plaintiffs had an *implied* contractual right to receive the Grant Benefit, as it was defined in the 1993–2007 MOUs, throughout their retirement."

extrinsic evidence are thus well within the scope of *Harris I*'s remand.

Moreover, the district court allowed the filing of the SAC, rather than rejecting it as inconsistent with our directive in *Harris I*. "The decision of whether to grant leave to amend . . . remains within the discretion of the district court." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). Having done so, the district court was obliged to determine whether that complaint stated a claim — which, we now conclude, it did.

## B.

Our question is whether in light of the *REAOC* opinions and *Sonoma*, the SAC sets forth sufficient allegations regarding the continuation of the Grant Benefit during Retirees' lifetimes to survive a motion to dismiss. It does.

*Sonoma* set forth the framework for deciding a case like this one, in which the MOU is explicit as to the substance of the benefit but not as to its term: "[T]o survive a motion to dismiss, the . . . complaint must plausibly allege that the County: (1) entered into a contract that included implied terms providing healthcare benefits to retirees that vested for perpetuity; and (2) created that contract by ordinance or resolution." 708 F.3d at 1115.[4]

*Sonoma* held that the plaintiff association in that case "met the first requirement by plausibly alleging that: (1) the County entered into a contract; (2) the contract provided healthcare benefits to retirees; and (3) the contract included

---

[4] As explained below, the second of these requirements is not seriously disputed.

an implied term that the benefits were vested for perpetuity." *Id.* Specifically, the association met the first two elements by alleging that the County entered into MOUs that "promised healthcare benefits" — and "[t]here is no doubt that the MOUs are contracts." *Id*. at 1115–16. As to the last of these elements, *Sonoma* concluded that the

> complaint also plausibly alleges that the County intended these healthcare benefits to vest for perpetuity. The complaint states that the County conveyed this intent "in writing, orally, by implication, and through practice." The Association supported this allegation with factual matter, including: (1) MOUs, resolutions, and other documents establishing the County's long-standing course of conduct; (2) allegations that former employees who drafted these documents would testify in support of the Association's position regarding the "background, purpose, and intent" of the documents; and (3) statements that at least one former Board member would testify as to the County's intent that the benefits vest in perpetuity.

*Id.* at 1116. To the extent the point was unclear before, *Sonoma* clarified that, once a plaintiff identifies an express contract covering the substance of a benefit, it may rely on extrinsic evidence to prove the existence of an implied term requiring the continuation of that benefit in perpetuity. *REAOC V* reiterated this point, emphasizing that "[w]e do not cabin the role of extrinsic evidence as narrowly as the district court did. Indeed, the California Supreme Court recognized the role of 'convincing extrinsic evidence,' and in *Sonoma* . . . , we noted that implied terms may include

'testimony regarding the County's intent.'"   742 F.3d at 1143 (citations omitted).

In this case, Retirees have alleged the existence of annual MOUs establishing a right to the Grant Benefit.   This allegation suffices to meet the first two elements of *Sonoma*'s first requirement.   Retirees further allege that they "had an implied contractual right to receive the Grant Benefit . . . throughout their retirement."   In support, the TAC makes specific allegations regarding the basis for this implied right, including allegations regarding the course of negotiations for the Grant Benefit.   Retirees' allegations plausibly support the conclusion that the County impliedly promised a lifetime benefit, which could not be unilaterally eliminated or reduced.

First, as evidence that the Grant Benefit was part of a bargained-for exchange, Retirees point to the agreement allowing the County to access $150 million in disputed surplus investment earnings controlled by OCERS.   Retirees allege that the County "estimated in 1993 that the mechanism as arranged and implemented," including the $150 million OCERS fund and the 1% wage contribution, "would cover the costs of the Grant program for at least 30 years."   The establishment of a long-term funding mechanism, including the commitment of a large sum of money that could have been used for other purposes, undermines the County's contention that there was no promise to provide the Grant Benefit beyond the duration of any single one-year MOU.   The logical extension of the County's argument is that it could have terminated the Grant Benefit in 1994, notwithstanding the receipt of the $150 million OCERS funds, an inference considerably less plausible than the converse inference — that the commitment of the OCERS funds indicates a continuing

obligation, and so refutes the County's year-by-year description of its obligation. The complaint thus contains, at a minimum, sufficient "factual content [to] allow[] the court to draw the reasonable inference" that the County promised to provide the benefit for a longer term than the period covered by each MOU. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Second, that active employees were required to contribute 1% of their wages to fund the Grant Benefit supports the notion that the parties intended the benefit to be available for employees throughout their retirements, rather than eliminated or reduced before employees could fully benefit from their earlier contributions. This understanding is strongly reinforced by the MOU's rebate provision, which allowed active employees to recoup any wages they contributed if they separated from County service before becoming eligible to receive the Grant Benefit. The rebate provision suggests that the contributions made by active employees were tied to future eligibility for the Grant Benefit, constituting a form of deferred compensation assured to those employees who continued working until they became eligible for retirement. To reduce the benefit during the retirements of the same employees who had funded it breaches that implicit commitment. The SAC thus sufficiently alleges that the County "entered into a contract that included implied terms providing healthcare benefits to retirees that vested for perpetuity." *Sonoma*, 708 F.3d at 1115.[5]

---

[5] We note, however, that Retirees may not at this juncture have as much contemporaneous evidence of legislative intent to create a contractual right to lifetime benefits as the plaintiff association did in *Sonoma*. Further, Retirees will have to bear their "heavy burden,"

To survive a motion to dismiss, *Sonoma* requires, finally, that Retirees allege that the County "created that contract by ordinance or resolution." *Id.* In *Sonoma*, the plaintiff association did not do that. Although "the complaint alleged that the MOUs were 'Board-ratified,' it did not allege that the Board ratified the MOUs by resolution or ordinance; nor did the [plaintiff association] submit copies of any such resolutions or ordinances with the amended complaint." *Id.* at 1117. *Sonoma* therefore remanded to the district court to allow the plaintiff association to amend the complaint to cure this pleading defect.[6]

---

*REAOC III*, 52 Cal. 4th at 1190, of establishing an implied right to vested benefits notwithstanding the explicit anti-vesting clause in the 1993 Retiree Medical Plan document.

As to the second concern, we note that Retirees' contract claims are premised on the express and implied terms of the *MOUs*, not the Retiree Medical Plan, a separate document. Unlike the MOUs, which were the product of collective bargaining, the Retiree Medical Plan was unilaterally created by the County. Retirees maintain that "[t]he 1993 Plan Document," including its anti-vesting provision, "was not incorporated into or referenced in the binding contracts between the County and the unions, and there is no indication that its contents were ever discussed with or disclosed to the unions during the negotiations that led to the adoption of those agreements." The simple existence of the anti-vesting clause, therefore, provides no basis for holding Retirees' implied contract claims implausible as a matter of law.

[6] On remand, the *Sonoma* district court held that the plaintiff association was able to "solve this problem" by filing "twenty-six resolutions . . . contain[ing] language expressly adopting the MOUs highlighted in the Ninth Circuit's opinion." *Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty.*, C 09-4432 CW, 2015 WL 1870841, at *7 (N.D. Cal. Apr. 23, 2015).

Here, by contrast, Retirees attached to the SAC the Board resolution expressly adopting the terms of the "exemplar" 1993 MOU. The County has not disputed that each annual MOU was similarly adopted by resolution of the Board.[7] We require nothing more at this pleading stage of the litigation.

We therefore reverse the district court's order insofar as it dismissed Retirees' contract claims regarding the Grant Benefit.

## III. Age Discrimination

Retirees' FEHA age discrimination claim challenges the elimination of the Retiree Premium Subsidy.

We begin by reiterating that Retirees had no contractual right to continue receiving the Retiree Premium Subsidy. *REAOC V* so held, and that conclusion is binding here. 742 F.3d at 1142. Our inquiry must therefore proceed *ab initio* — that is, as if the County decided for the first time to provide retiree health benefits and chose at that point to create separate active and retiree pools for calculating insurance premiums, taking into account in doing so that the retiree pool is older, on average, than the active employee pool.

---

[7] The County contends that Retirees "fail to satisfy the second factor of requirement alleging a contract 'created . . . by ordinance or resolution'" because the MOUs and Board resolutions adopting them do not contain an implied vesting term. This argument is just a restatement of the County's position, which we have rejected, regarding *Sonoma*'s first requirement.

As a general matter, California law "'does not require equal health care benefits for active employees and retirees.'" *Orange Cty. Emps. Ass'n v. Cty. of Orange*, 285 Cal. Rptr. 799, 805 (Cal. Ct. App. 1991) (quoting *Ventura Cty. Retired Emps.' Ass'n v. Cty. of Ventura*, 279 Cal. Rptr. 676, 678 (Cal. Ct. App. 1991)).**[8]** After a thorough "review of [California's] entire statutory scheme," *Orange County Employees Association* rejected the contention that a local government was required to provide the *same* health coverage to retirees as to active employees, at no increased cost to retirees. 285 Cal. Rptr. at 805. It specifically held that "local agencies [are permitted] to consider the differences between retired and active employees in providing health benefits," and that such agencies are not required to "provide the same medical benefit package to retirees and active employees." *Id.* We could not, therefore, fault the County for offering different benefits to retirees and to active employees at the outset, absent a FEHA violation.

FEHA was enacted "to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment." Cal. Gov't Code § 12920. To that end, FEHA makes it "an unlawful employment practice . . . [f]or an employer, because of the . . . age . . . of any person, to . . . discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code § 12940(a). Retirees assert that the County's decision to

---

**[8]** Federal law also permits certain exemptions for special types of health insurance, including "retiree-only" plans. *See Carson v. Lake Cty., Ind.*, 865 F.3d 526, 530 (7th Cir. 2017). For example, as we have recently held, retiree-only health plans are not covered by parts of the Employee Retirement Income Security Act ("ERISA"). *See King v. Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 739–40 (9th Cir. 2017).

"split the pool" and thereby eliminate the Retiree Premium Subsidy violated FEHA by "target[ing] 'retirees' *based on . . .* express stereotyped assumptions that (1) a 'retiree' is likely to be older than an active employee; and (2) an older person is likely to have higher health costs than a younger one."

"[B]ecause California courts have interpreted [FEHA] in accordance with cases interpreting the Age Discrimination in Employment Act ('ADEA'), and the federal Civil Rights Act, we look to federal cases in those areas" in evaluating novel FEHA claims. *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 866 (9th Cir. 1996) (citations omitted). Here, there are no reported California cases discussing the interplay of retirement status and age discrimination under FEHA, so we turn to federal case law for guidance.

First, this circuit has not decided whether the ADEA applies to retirees. We hold that it does.[9]

Interpreting the term "employees" in the context of Title VII's anti-retaliation provision, the Supreme Court observed that "the word 'employed' [in the definition of "employee"][10] . . . could just as easily be read to mean '*was*

---

[9] *Kentucky Retirement Systems v. EEOC*, 554 U.S. 135, 138 (2008), assumed, but did not address directly, whether the ADEA applies to retirees; the question therefore remains open. *See, e.g.*, *Sorenson v. Mink*, 239 F.3d 1140, 1149 (9th Cir. 2001) ("[U]nstated assumptions on non-litigated issues are not precedential holdings binding future decisions." (citation omitted)).

[10] Title VII defines "employee" as "an individual employed by an employer," except "any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with

employed.'" *Robinson v. Shell Oil Co.*, 519 U.S. 337, 342 (1997). It therefore concluded that an employer's adverse treatment of individuals who were no longer employed could nonetheless constitute discrimination against "employees." *Id*.

Like Title VII, the ADEA defines the term "employee" as "an individual employed by any employer." 29 U.S.C. § 630(f). The Third Circuit, in a persuasive opinion, applied *Robinson* to the ADEA, ruling that "the ADEA applies even when retiree benefits are structured discriminatorily after retirement," rather than before retirement. *Erie Cty. Retirees Ass'n v. Cty. of Erie*, 220 F.3d 193, 210 (3d Cir. 2000). Like the Third Circuit, we construe the definition of "employee" and of "employee benefits" in the ADEA in favor of the ADEA's broad anti-discrimination purpose, and are persuaded that Congress intended the statutory protections to cover post-employment benefits for already retired employees.

As to the application of the usual ADEA/FEHA analogue here, we note that "the statutory definition of 'employee' [in the FEHA statute] does not actually define who is an employee under the FEHA; it merely excludes persons employed by close relatives and those 'employed' by nonprofit sheltered workshops and rehabilitation facilities. Therefore . . . the FEHA definitional provision is not particularly helpful in determining under what circumstances one may be considered to be an employee for purposes of the FEHA." *Mendoza v. Town of Ross*, 128 Cal. App. 4th 625, 632 (2005). "More helpful is the definition of 'employee' contained in regulations enacted by the

---

respect to the exercise of the constitutional or legal powers of the office." 42 U.S.C. § 2000e(f).

Department of Fair Employment and Housing" ["DFEH"] — "[a]ny individual under the direction and control of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written." *Estrada v. City of Los Angeles*, 218 Cal. App. 4th 143, 148 (2013); Cal. Code Regs., tit. 2, § 11008(c).

Neither the FEHA's statutory (non)definition nor the DFEH's regulatory definition provides any basis for departing from the norm of construing the FEHA as parallel to the ADEA. Like the ADEA, the statute uses the term "employed" in the employee exclusions, which could mean "was employed." The regulation uses the term "under the direction and control of an employer," which also could include individuals under such control in the past. And the policy considerations under the two statutes favoring inclusion of retirees are also the same, *see Erie*, 220 F.3d at 210. We therefore hold that changes in retirees' health benefits *are* covered by the FEHA, despite the fact that they are not active employees.

Crucially, however, the County's elimination of the subsidy does not discriminate *among* retirees based on age. *Cf. Am. Ass'n of Retired Pers. v. EEOC*, 489 F.3d 558 (3d Cir. 2007). Nor does the subsidy elimination distinguish among active employees based on age, or against active employees who are old enough to retire but have not. The sole question before us is whether the County, under the ADEA and so under California's FEHA age discrimination provisions, may treat retirees *as a group* differently, with regard to medical benefits, than employees *as a group*, taking into account that the cost of providing medical benefits to the retiree group is higher because the retirees are on average older. We conclude that it may.

The starting point for this inquiry is *Hazen Paper Company v. Biggins*, 507 U.S. 604 (1993). *Hazen* concerned "whether an employer violates the ADEA by acting on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age." *Id.* at 608. The Court held that "liability depends on whether the protected trait (under the ADEA, age) *actually motivated* the employer's decision" and "had a determinative influence on the outcome." *Id.* at 610 (emphasis added). Observing that the "essence of what Congress sought to prohibit in the ADEA" is making employment decisions based on "inaccurate and stigmatizing stereotypes" about older employees, the Court explained that when an employment "decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears . . . even if the motivating factor is correlated with age, as pension status typically is." *Id.* at 610–11 (emphasis omitted). In short, "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age."[11] *Id.* at 609; *see also Kentucky Retirement System v. EEOC*, 554 U.S. 135, 148 (2008) ("Where an employer adopts a pension plan that includes age as a factor, and that employer then treats employees differently based on pension status, a plaintiff, to state a disparate-treatment claim under the ADEA, must adduce sufficient evidence to show that the differential treatment was 'actually motivated' by *age*, not pension status."); *Smith v. City of Jackson*, 544 U.S. 228, 242 (2005) (holding that a decision to give raises based on an

---

[11] The Supreme Court has subsequently made clear that mixed-motive age discrimination claims are not permitted under the ADEA: Plaintiffs bringing disparate treatment claims must prove that age was the "but-for" cause of the employer's adverse decision. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–78 (2009).

employee's seniority and position — factors correlated with age — "was a decision based on a 'reasonable facto[r] other than age'" and therefore did not violate the ADEA).

Having so held, *Hazen* was careful not to rule out "the possibility that an employer who targets employees with a particular pension status on the assumption that these employees are likely to be older thereby engages in age discrimination." 507 U.S. at 612–13.

Critically for present purposes, however, *Hazen* concerned the comparative treatment of active employees based on whether they were eligible to retire, not a comparison of the benefits provided to active employees and to retirees. *See id*. Conversely, *Kentucky Retirement* concerned a comparison of the benefits provided to different retirees — again, no comparison of the benefits provided to active employees and to retirees was at stake. 554 U.S. at 138. The two cases, consequently, are informative here in their holdings that a focus on retiree status alone is not itself age discrimination, but they do not address whether, where the issue is calculating benefits for all retirees as a group, it is an ADEA or FEHA violation to consider that retirees as a group are on average older than active employees as a group.

Retirees nonetheless maintain that here, pension status was not a "factor other than age" but rather an impermissible "proxy for age." *Id.* at 610, 613; *Kentucky Retirement*, 554 U.S. at 142. As evidence, they point to statements by County officials made both contemporaneously with the decision to charge employees more for medical benefits and during the course of litigation, as well as to reports prepared to assist the County in deciding how to restructure retiree

health benefits.[12]  For example, the 2004 report notes "that a 45 year-old can be expected to have less than $3,000 per year in claims, while a 60 year-old would have well over $4,000 per year."  They argue that reliance upon such age-based generalizations constitutes using retiree status as a proxy for age within the meaning of *Hazen*, even though, among retirees, the cost of medical benefits does not vary by age.  Such class-based treatment, they maintain, is prohibited by analogy to *Los Angeles Department of Water and Power v. Manhart*, 435 U.S. 702, 708 (1978), and *Arizona Governing Committee v. Norris*, 463 U.S. 1073, 1084 (1983).

Retirees' reliance on *Manhart* and *Norris* is fundamentally misplaced.  *Manhart* invalidated as discriminatory a retirement plan's requirement that female employees make larger pension contributions while working.  Having determined that "female employees, on the average, will live a few years longer than . . . male

---

[12] Allegations regarding the 2004 report are contained only in Retirees' Fourth Amended Complaint, never accepted by the district court.  Retirees, however, put on evidence regarding the report at the April 29, 2013 hearing on the County's motion to dismiss the TAC, and, in denying Retirees' request for leave to file a Fourth Amended Complaint, the district court stated that it had considered "Plaintiffs' proffer at the hearing about the Fourth Amendment Complaint" and concluded that "that the additional allegations would [not] cure the defects in the pleadings."  The district court thus denied leave to amend essentially on grounds that the proposed "amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc*., 656 F.3d 1034, 1041 (9th Cir. 2011).  In evaluating the district court's ruling in this regard, we too must consider the allegations in the proposed Fourth Amended Complaint. *See id*. at 1042 (reviewing a proposed amended complaint in assessing whether leave to amend should have been granted).  As these allegations were essentially considered by the district court as to the merits when denying leave to amend, we consider them in deciding this appeal.

employees," and, consequently, will, as a group, have higher pension payouts in total than men as a group, the employer charged each woman more in pension contributions than each man. *Manhart*, 435 U.S. at 705.

*Manhart* rejected the sex-based difference in pension contributions there challenged. "An employment practice that requires 2,000 individuals to contribute more money into a fund than 10,000 other employees simply because each of them is a woman, rather than a man, is in direct conflict with both the language and the policy of the Act. Such a practice does not pass the simple test of whether the evidence shows 'treatment of a person in a manner which but for that person's sex would be different.' It constitutes discrimination and is unlawful unless exempted by the Equal Pay Act of 1963 or some other affirmative justification." *Id.* at 711.

*Manhart* stands for the proposition that Title VII prohibits discrimination "against any *individual*" on account of "such *individual*'s" characteristics, *id.* at 708 (emphasis in original) (quoting 42 U.S.C. § 2000e-2(a)(1)), "squarely reject[ing] the notion that . . . an employer may adopt a retirement plan that treats every *individual* woman less favorably than every *individual* man," *Norris*, 463 U.S. at 1083 (emphasis added) (discussing *Manhart*). "[T]he basic policy of [Title VII] requires that we focus on fairness to individuals rather than fairness to classes," the Court explained. *Manhart*, 435 U.S. at 709. Because individual women may not fit the generalization on which the Department's policy was based — that is, they may not live as long as the average man — the Court concluded that the retirement plan was unfair to individual women. *Id.* at 711.

Likewise, in *Norris*, the Court held that employers may not offer employees the option of receiving retirement

benefits from companies that pay a woman lower monthly retirement benefits than a "similarly situated" man who has contributed the same amount from his salary to the plan. 463 U.S. at 1074, 1083. "[I]t is just as much discrimination 'because of . . . sex,'" the Court explained, "to pay a woman lower benefits when she has made the same contributions as a man as it is to make her pay larger contributions to obtain the same benefits." *Id.* at 1086.

Unlike the retirement plans in *Manhart* and *Norris*, the County's plan does not discriminate against "similarly situated" persons on the basis of a prohibited characteristic, here, age. Rather, the retirees' contention is that in calculating the rate to be charged to retirees as a *group* — a classification that, under *Hazen*, is not itself an age-based classification — age was taken into account. But *Manhart* specifically noted that its holding did not "call into question the . . . practice of considering the composition of an employer's work force in determining the probable cost of a retirement . . . plan" and that it was not "unlawful to determine the funding requirements for an establishment's benefit plan by considering the composition of the entire force." *Manhart*, 435 U.S. at 718 & n.34.

It is this aspect of *Manhart* — the recognition that the setting of benefits or rates for the pertinent covered group of employees as a whole, termed the "entire force" in *Manhart*, by taking sex actuarially into account, would not be discrimination based on sex — that controls here. The County does not, among retirees, charge more to older than younger retirees. From the outset, the County treated employees differently from retirees for purposes of medical benefits, most notably by paying for most of the medical benefits of active employees but requiring retired employees to pay for most of their own, with some help from the Grant

Benefit.   That fundamental differentiation has not been challenged here — not surprisingl`y, as, under California law, retirees need not be provided medical benefits at all.  By adopting the split-roll for the purpose of calculating premiums for medical insurance, the County was simply following through on its determination that already retired persons, who have ceased providing any services to the County, are a separate "force" — in *Manhart* terms — from the "force" of active employees.   Nothing in *Manhart* prohibits considering retirees as a separate group for purposes of calculating the cost of benefits, and making cost determinations related to that separate group on the basis of the age of the cohort as a whole — just as employee medical plans can calculate the *equal* premiums charged to every active individual employee by actuarially taking into account the age and gender distribution of all active employees.

Retirees have not cited any case to the contrary.  Instead, Retirees rely principally on cases in which some active employees were treated differently from other active employees, allegedly because of age.  As we have explained, neither *Hazen* nor *Kentucky Retirement* concerned a circumstance in which the contention was that retirees as a group were treated differently than active employees as a group based on the average older age of retirees.  And in other cases Retirees cite, the plaintiffs sought or held active employment, but were treated differently from similarly situated job seekers or employees on account of their retirement eligibility or status.  *See, e.g.*, *EEOC v. Local 350, Plumbers & Pipefitters*, 998 F.2d 641, 646 (9th Cir. 1992); *Hilde v. City of Eveleth*, 777 F.3d 998, 1002–03 (8th Cir.

2015).**[13]**  We have found *no* case after *Hazen* and *Kentucky Retirement* suggesting that an employer's unequal treatment of retirees vis-à-vis active employees can amount to unlawful discrimination on the basis of age, whether or not the average older age of retirees is taken into account in deciding on policy affecting retirees.  Actually retired workers who are not working and not seeking to work are simply not similarly situated to the County's active employees as to whom they seek equal treatment.

Under California law, public employees need not provide retired employees medical benefits.  Here, the County has chosen to provide some access to retiree medical care, albeit on different terms, and at different premium rates from those applicable to active employees.  Active employees eligible for retirement — a substantial number of whom are older than many retirees — receive the medical benefits paid by other active employees, without regard to age.  Under these circumstances, calculating the rates charged to retirees separately from those applicable to active employees, taking into account the higher medical costs of the older cohort of retirees, does not constitute impermissible discrimination against the retirees based on age.  The overall distinction between the medical plans covering active employees and retirees is, under *Hazen*, not itself discrimination based on age, and calculating the rate charged every retiree, regardless of age, by taking average age into account is not, under *Manhart*, discrimination against any individual retiree based on a protected category.

---

**[13]** Additionally, *Local 350* was decided before *Hazen*, and, inconsistently with *Hazen*, treated retirement status as necessarily a proxy for age.

In short, where employers are not required to provide post-retirement benefits *at all*, and particularly where retirees as a force are covered by separate benefit terms, the County does not violate the FEHA by treating retirees as a separate force and making cost calculations accordingly, taking into account the age distribution of the retiree group as a whole. Retirees' claim of unlawful age discrimination under FEHA fails as a matter of law.

## IV.

For the foregoing reasons, we affirm in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.[14]

**AFFIRMED in part, REVERSED in part, REMANDED for further proceedings.**

---

[14] We deny Retirees' motion to reassign the case on remand. "Absent proof of personal bias on the part of the district judge, remand to a different judge is proper only under unusual circumstances." *United States v. Reyes*, 313 F.3d 1152, 1159 (9th Cir. 2002). There is no claim of personal bias here, and the record reveals none. Nor do we find any "unusual circumstances" warranting reassignment. This case presents complicated questions with which the district court, this Court, and the California Supreme Court have wrestled over the past several years. There is no indication that Judge Andrew J. Guilford has been inflexible in applying this Court's precedent as it has developed. Moreover, given the overlap between this case and the *REAOC* litigation, which proceeded to discovery and summary judgment, there would be significant duplication if another judge were required to familiarize himself or herself with the case.